IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

DONNA GREEN,                          )
                                      )
          Plaintiff,                  )
                                      )
v.                                    )          CIVIL ACTION NO. 5:06-00576
                                      )
MICHAEL J. ASTRUE,                    )
Commissioner of Social Security,      )
                                      )
          Defendant.                  )

M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security

denying Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security

Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-

1383f. This case is presently pending before the Court on Plaintiff's Motion for Remand (Doc. No.

13.) and Defendant's Motion for Judgment on the Pleadings (Doc. No. 14.). Both parties have

consented in writing to a decision by the United States Magistrate Judge. (Doc. Nos. 4 and 5.)

The Plaintiff, Donna Green (hereinafter referred to as "Claimant"), filed applications for DIB

and SSI on April 2, 2004, (protective filing date),[1] alleging disability as of May 10, 2003, due to a

shattered right knee cap, displaced left clavicle, arthritis, tendinitis, bursitis, scoliosis, and

depression.[2] (Tr. at 27, 64, 65-67, 86, 291-93.) The claim was denied initially and upon

_____

[1] The Commissioner notes that Claimant's SSI application and initial and reconsideration
denials were unavailable for inclusion in the transcript but that the documents "are duplicative in
substance to her DIB application." (Doc. No. 13 at 2, n.1.)

[2] On her form Request for Consideration, Claimant alleged in addition to the foregoing
conditions that she experienced hurting all over her body, bronchitis, sinusitis, dizzy spells, a
worsened back condition, and locking knees. (Tr. at 30, 32.)

reconsideration. (Tr. at 27-29, 32-34, 295-97, 299-301.) On November 5, 2004, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 35.) The hearing was held on December 7, 2005, before the Honorable Thomas R. King. (Tr. at 317-40.) By decision dated April 13, 2006, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 14-24.) The ALJ's decision became the final decision of the Commissioner on June 30, 2006, when the Appeals Council denied Claimant's request for review. (Tr. at 6-9.) On July 24, 2006, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2004). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e),

2

416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2002). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

*(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such

3

factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[3] Fourth, if the claimant's impairment(s) is/are

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity at any time relevant to the decision. (Tr. at 16.) Under the second inquiry, the ALJ found that Claimant suffered from right knee and back impairments, which were severe impairments. (Tr. at 17.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 20.) The ALJ then found that Claimant had a residual functional capacity for work at the sedentary level of exertion, that affords Claimant a sit/stand option. (Tr. at 20.) At step four, the ALJ found that Claimant could not return to her past relevant work. (Tr. at 22.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant

could perform jobs such as an interviewer and a reception information clerk, at the sedentary level

of exertion. (Tr. at 23.) On this basis, benefits were denied. (Tr. at 23-24.)

Scope of Review

      The sole issue before this Court is whether the final decision of the Commissioner denying

the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was

defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular
> conclusion. It consists of more than a mere scintilla of evidence but may be
> somewhat less than a preponderance. If there is evidence to justify a refusal to direct
> a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d

640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving

conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the

Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the

record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch,

495 F.2d 396, 397 (4th Cir. 1974).

      A careful review of the record reveals the decision of the Commissioner is supported by

substantial evidence.

Claimant's Background

      Claimant was born on October 17, 1966, and was 39 years old at the time of the

administrative hearing. (Tr. at 22, 65, 323.) Claimant had a high school education and vocational

training as a sewing machine operator, press operator, and certified nurse assistant. (Tr. at 92, 324-

25.) In the past, she worked as a nursing assistant,. (Tr. at 22, 87, 104-08, 325, 336.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ (1) erred in not finding that Claimant's medical conditions were disabling from May 10, 2003, through December 7, 2005, and (2) failed to explain inconsistencies between the VE's testimony and the Dictionary of Occupational Titles. (Pl.'s Br. at 3-7.) The Commissioner asserts that these arguments are without merit and that substantial evidence supports the ALJ's decision. (Def.'s Br. at 7-11.)

Analysis.

1. Severe Impairments.

To be deemed disabled, a claimant must have an impairment or combination of impairments which is severe. 20 C.F.R. §§ 404.1520(c); 416.920(c) (2004). Under current law, a severe impairment is one "which significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c); 416.920(c) (2004); see also 20 C.F.R. §§ 404.1521(a); 416.921(a) (2004); Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987) (recognizing change in severity standard). "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b); 416.921(b) (2004). Examples of basic work activities under those sections are:

> (1)Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

7

(2)Capacities for seeing, hearing, and speaking;
(3)Understanding, carrying out, and remembering simple instructions;
(4)Use of judgment;
(5)Responding appropriately to supervision, co-workers and usual work situations;  and
(6)Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521(b); 416.921(b) (2004). Additionally, a severe impairment is one which "must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. §§ 404.1509; 416.909 (2004).

"RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling ("SSR") 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2004). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner. See 20 C.F.R. §§ 404.1527(e)(2); 416.927(e)(2)(2004).

In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

8

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

A two-step process is used to determine whether a claimant is disabled by pain. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain alleged. 20 C.F.R. §§ 404.1529(b), 416.929(b) (2004); SSR 96-7p; see also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). If such an impairment is established, then the intensity and persistence of the pain and the extent to which it affects a claimant's ability to work must be evaluated. Id. at 595. When a claimant proves the existence of a medical condition that could cause pain, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative. Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4) (2004). Additionally, the regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons.  . . . Factors relevant to your symptoms, such as pain, which we will consider include:
>
> (I) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any

9

medication you take or have taken to alleviate your pain or other symptoms;

(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2004).

SSR 96-7p repeats the two-step regulatory provisions. See SSR 96-7p, 1996 WL 374186 (July 2, 1996). Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a claimant's ability to function along with the objective medical and other evidence in determining whether the claimant's impairment is "severe" within the meaning of the regulations. A "severe" impairment is one which significantly limits the physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c).

Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a claimant's allegations solely because there is no objective medical evidence of the pain itself. Craig, 76 F.3d at 585, 594; SSR 96-7p ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). For example, the allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain. Id. at 595. Nevertheless, Craig does not prevent an

ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision. The only analysis which Craig prohibits is one in which the ALJ rejects allegations of pain solely because the pain itself is not supported by objective medical evidence.

Claimant argues that the ALJ failed to address substantially whether Claimant was disabled for at least twelve months between May 10, 2003, the date of her motor vehicle accident, and December 7, 2005, the date of the administrative hearing. (Pl.'s Br. at 3-5.) She asserts that "there was at least one period lasting longer than twelve months in which [she] was disabled." (Id. at 3.) Claimant concedes that she was capable of performing sedentary work as of December 7, 2005. (Id. at 3.) The Commissioner asserts that the injuries from Claimant's motor vehicle accident were not disabling, that Claimant's argument is without merit, and that the ALJ's decision is supported by substantial evidence. Given the dates cited by Claimant, the Court considers Claimant to argue that the ALJ erred in not finding that the injuries sustained in a motor vehicle accident were not disabling.

On May 10, 2003, Claimant sustained several injuries in a motor vehicle accident, including a right ulna fracture, a right iliac wing fracture, a comminuted right patella fracture, a left clavicle fracture, a bony mallet finger injury to her left ring finger, and two fractured ribs. (Tr. at 141-57.) Dr. Ian D. Archibald, M.D., a neurosurgeon, performed open reduction, partial patellectomy, and screw and wire repair to her right knee, and placed her right arm in a short arm splint. (Tr. at 143.) Following the accident and her release from the hospital, Claimant continued treatment with Dr. Ian D. Archibald, M.D. (Tr. at 141-57, 158-64, 252-55.) On May 21, 2003, Claimant presented with good neurovascular and motor function of her fingers with no significant swelling; tenderness along the left clavicle, primarily at mid-shaft; full range of neck motion; limited range of shoulder motion,

11

secondary to clavicle discomfort; mild swelling of her right knee; and tenderness over the iliac wing. (Tr. at 164.) Post-surgical x-rays revealed satisfactory position of her fractures. (Tr. at 158.)

On June 18, 2003, five and one half weeks status post her injuries, Claimant had almost normal right shoulder range of motion; good position of her bony injury and mallet finger splint; no complaints regarding the iliac wing fracture; some soreness from the ulna fracture, which was removed from the cast and was healing slowly; and right patella range of motion at 90 degrees, with good straight leg raise and no crepitation. (Tr. at 162.)

On September 3, 2003, four months after Claimant's motor vehicle accident, Dr. Archibald opined that Claimant appeared "to have pretty much resolved all of those injuries for the moment." (Tr. at 158.) On exam, Claimant had full range of left shoulder motion with no complaints of significant pain and full mobility of her left ring finger mallet finger injury, with no residual loss of extension. (Tr. at 158.) Regarding her right shoulder strain, Dr. Archibald noted that Claimant continued to have some achiness at times but that it seemed the injury had "pretty much recovered and it does not appear at this point she needs any further workup on the shoulder." (Id.) Dr. Archibald noted that Claimant's most significant injury was the right patella fracture, which did not give Claimant any significant pain. (Id.) Claimant reported that she was able to climb stairs normally, and was able to squat, although for a limited period of time. (Id.) Dr. Archibald therefore, opined that Claimant's injuries had healed. (Id.) He approved Claimant's request to return to work, noting that she did not require any pain medication. (Tr. at 159.)

Dr. William Humphries, M.D., performed a consultative examination of Claimant on July 2, 2004. (Tr. at 165-70.) On physical examination, Claimant had moderately reduced range of neck and back motion, due to pain in the entire back area, without kyphosis, scoliosis, or paravertebral muscle spasms. (Tr. at 166.) She had full range of motion of the lower extremities without tenderness, heat,

swelling, or deformity, except for bilateral shoulder reduction motion due to pain and mild tenderness to the base of the cervical spine. (Tr. at 166.) Claimant exhibited moderate tenderness and synovial thickening of her right knee but no joint laxity or erythema. (Id.) She had a slightly antalgic gait on the right side, was unable to heel and toe walk due to knee pain, and was able to bear weight on each leg but with increased right knee pain. (Tr. at 167.) Dr. Humphries noted normal muscle strength and no significant muscle wasting, but noted that Claimant had some parapatellar sensory loss to light touch on the right side. (Id.) Dr. Humphries opined that Claimant would be limited to sitting six hours in an eight hour workday, standing and walking two hours in an eight hour workday, and lifting 25 pounds occasionally and ten pounds frequently. (Tr. at 168.) He further opined that she could only occasionally climb, stoop, kneel, crouch, or crawl, and should avoid exposure to heights, hazards, and fumes. (Id.)

Dr. Michael J. Hartman, M.D., a state agency physician, completed a form Residual Functional Capacity Assessment (Physical) on September 25, 2004. (Tr. at 171-76.) Dr. Hartman opined that Claimant was capable of performing light work with only occasional postural activities and an avoidance of even moderate exposure to hazards. (Tr. at 172-74.) He further opined that the evidence established "medically determinable impairments of Degenerative Joint Disease and Scoliosis." (Tr. at 175.) R. Hugh Tenison, Ph.D., completed a Psychiatric Review Technique Form on September 27, 2004, which was affirmed by R. J. Milan, Jr., Ph.D., on October 22, 2004. (Tr. at 177-90.) Dr. Tension opined that Claimant suffered from a non-severe depressive syndrome and had no limitations of activities of daily living, social functioning, or episodes of decompensation, and only mild limitations in maintaining concentration, persistence, or pace. (Tr. at 188.)

On November 3, 2004, Claimant's primary care physician, Dr. Norma C. Yu, M.D., noted Claimant's complaints of right hip and knee pain and low back pain, for which she prescribed

Tylenol No. 3 and Flexeril. (Tr. at 194.) In November, 2004, Claimant underwent arthroscopic surgery with removal of tension hardware. (Tr. at 255.) Dr. Archibald noted on December 1, 2004, that Claimant continued to experience popping and catching of the right knee and weakness, which caused her to continue to use crutches. (Id.) He noted that she had a bad snap along the anterolateral joint line and lateral femoral condyle, which she had not before experienced. (Tr. at 255.) He recommended that she undergo motion exercise, including an exercise bike. (Id.) The popping and catching continued on December 15, 2004, with a lot of pain. (Tr. 255.) Claimant however, could not reproduce the popping in Dr. Archibald's office. (Id.) He noted that her right patella fracture had healed but experienced severe post-traumatic chondromalacia status post arthroscopic chondroplasty of patella and removal of tension hardware. (Id.) He opined that he was "optimistic given what [he was] seeing objectively as an improvement that will continue." (Id.) He recommended physical therapy, which had helped, and an exercise bike. (Id.)

On January 10, 2005, Claimant reported that the crepitus was much better and that although she had difficulty climbing stairs, she believed that her condition was improving. (Tr. at 254.) On exam, she had good ranges of motion, full extension without crepitus, good flexion, and good ligamentous stability without obvious effusion of the knee. (Id.) Claimant expressed concern however, that she developed arthralgia throughout her body, for which he prescribed anti-inflammatory medication and suggested that Dr. Yu check for rheumatoid and connective tissue disorders. (Id.)

Dr. Yu referred Claimant to Dr. John A. Feldenezer, M.D., for a neurosurgical consult, on January 20, 2005. (Tr. at 252-53.) Claimant reported that she experienced right greater than left sciatic pain with intermittent numbness in both feet, for the past several weeks. (Tr. at 252.) On examination, Claimant had full range of neck motion, without spasm or bruit; a clear chest; normal

heart; and normal bulk, tone, strength, and deep tendon reflexes of her extremities, without edema. (Id.) She had negative straight leg raising and intact sensation except in S1 dermatomes which sensation was diminished bilaterally. (Tr. at 253.) However, she had hamstring tightness bilaterally and was tender over the lumbosacral junction and right sacroiliac and sciatic notch areas. (Id.) Her gait was unremarkable. (Id.)

At L3-4 and L5-S1, Claimant had lumbosacral scoliosis and disc space narrowing, pursuant to x-rays of her spine. (Tr. at 253.) A lumbar MRI revealed degenerative changes at L3-L4 and L5-S1, minimal disc bulging at L3-4, very small right paracentral protrusion at L5-S1, which abuts, but does not displace or compress the S1 nerve root on the right; and no compression on the left. (Id.) Dr. Feldenezer assessed lumbar pain syndrome with some radicular symptoms and very minimal disc herniation on MRI. (Id.) He noted however, that she did "not have a neurological deficit other than diminished pin and she [did] not have mechanical signs of radiculopathy." (Id.) Dr. Feldenezer could not explain Claimant's left leg symptoms. (Id.)

Dr. Feldenezer referred Claimant to Dr. Murray E. Joiner, M.D., a pain specialist, for administration of epidural steroid injections and treatment recommendations. (Tr. at 253.) Dr. Joiner administered two injections on January 25, and February 9, 2005. (Tr. at 279-81.) On February 1, 2005, Dr. Joiner's initial exam revealed mild cervical paraspinal and trapezial tenderness with increased tone but full range of motion. (Tr. at 276.) He noted decreased lumbar lordosis and deconditioning of the lumbar paraspinals, bilateral lumbar paraspinal tenderness with increased tone, bilateral S1 joint tenderness, bilateral gluteal tenderness with increased tone, and increased pain with extension past neutral bilaterally at L4-5 and L5-S1. (Id.) She also had increased right knee pain on straight leg raising. (Id.) Dr. Joiner diagnosed chronic low back pain and spasms, S1 joint dysfunction and pain, and lumbar debilitation. (Id.) On April 26, 2005, Claimant reported that her

15

pain alternated in severity and was then at a tolerable level. (Tr. at 269.) She noted that her sternoclavicular joint popped a lot with movement and that her low back pain was dull and aches with occasional throbbing. (Id.) Claimant further noted that due to the loss of her father and having a sick uncle, she was under a lot of stress. (Id.)

On May 16, 2005, Dr. Joiner opined that Claimant experienced objectively resolving lumbar spasms and pain and controlled bilateral S1 joint dysfunction and pain. (Tr. at 260.) Pursuant to Claimant's instructions, he withheld further intervention. (Id.) In September and November, 2005, Claimant continued to report diffusely thoracic and lumbar spine pain with radiation bilaterally into the upper and lower extremities. (Tr. at 285-90.) Dr. Joiner opined that she experienced chronic repeated thoracolumbar myalgia, bilateral sciatica, and lumbar degenerative disc disease. (Id.) Claimant continued to resist further aggressive care. (Tr. at 286.)

In his decision, the ALJ summarized the medical evidence of record and acknowledged Claimant's injuries from the May, 2003, motor vehicle accident. (Tr. at 17-20.) He found, however, that the medical evidence demonstrated that the injuries to Claimant's left shoulder, right arm and wrist, right hip, and ribs "had healed without compromise or complication." (Tr. at 19.) He noted that examination findings from multiple specialists revealed full range of neck motion and full motor strength and use. (Id.) The ALJ, therefore, found that excepting her "right knee which was weakened by two surgeries, and the claimant's back which has diagnostic findings of disc bulge and degenerative changes, the remainder of the claimant's musculoskeletal injuries would not singly, or combination, limit or restrict her performance of wide range of work activities." (Tr. at 19-20.)

Based on the foregoing, the Court finds that while Claimant experienced several fractures and injuries as a result of a May 10, 2003, motor vehicle accident, substantial evidence supports the ALJ's decision that all but her right knee and back injuries and conditions had healed without further

complication. Although she continued to experience mild to moderately reduced neck range of motion, the ALJ limited Claimant's residual functional capacity to work at the sedentary exertional level, with a sit/stand option, which was consistent with the assessments of the state agency physician and Dr. Humphries. Furthermore, the record does not contain any evidence of active treatment for depression, and therefore, the ALJ accepted the state agency physician's assessment that she had no severe mental impairments.

The ALJ further noted Claimant's testimony that she was unable to lift a gallon of milk due to hand cramps. (Tr. at 22.) However, the ALJ found that the evidence reflects no diminished manipulative abilities. (Id.) He further noted that Claimant's form Daily Activities Questionnaire dated May 3, 2004, indicated that she was able to work puzzles and crochet. (Id.) Accordingly, the Court finds that the ALJ's findings with regard to Claimant's shoulder, arm, wrist, hip, and rib injuries is supported by substantial evidence of record. [4]

The evidence further substantially supports the ALJ's finding that Claimant's back and right knee injuries were not disabling. Claimant reported that she experienced severe muscle spasms, back pain, feet pain and throbbing, an inability to sit or stand for prolonged periods of time, and an inability to ride roller coasters. (Tr. at 328.) She further testified that she had to alternate between sitting and standing at her son's ball games. (Tr. at 329.) Claimant testified that she was able to sit for 20 to 30 minutes at a time, stand for ten to fifteen minutes, and walk one block, with two to three stops for rest. (Tr. at 332-33.) The ALJ however, found that Claimant's symptoms were not entirely credible. (Tr. at 21.) He noted that she was capable of walking without an assistive device and had not reported falling due to the weakness and catching of her right knee. (Tr. at 22.) Additionally, the

---

[4] Claimant concedes for purposes of this argument that she was capable of performing sedentary work after December 7, 2005, and therefore, the Court does not address specifically the evidence pertaining to that period of time.

17

ALJ noted that an EMG study revealed that Claimant's back condition did not cause any nerve compromise or lower extremity radiculopathy. (Id.) He further noted that other than two epidural injections, Claimant was conservatively treated with anti-inflammatory medication and pain medication, indicative of only mild to moderate pain. (Id.)

Based on the foregoing, the Court finds that the ALJ properly considered the evidence of record and the opinions and RFC assessments, as well as Claimant's symptoms and pain in accordance with the applicable law and Regulations, and the ALJ's finding that Claimant's impairments were not disabling is supported by substantial evidence. Accordingly, Claimant's argument is without merit.

2. Conflict Between Vocational Expert Testimony and Dictionary of Occupational Titles.

Claimant next argues that the findings of the ALJ, based upon the testimony of the Vocational Expert ("VE") are in conflict with the Dictionary of Occupational Titles ("DOT"). (Pl.'s Br. at 5-7.) Specifically, Claimant asserts that the VE identified the job of "interviewer" as one which, according to the DOT, Claimant was capable of performing. (Id.) Claimant asserts, however, that there are only five interviewer jobs under the DOT, §§ 166.267-022, 166.267-010, 169.367-010, 168.267-038, and 205.367-014, and that four of the five jobs require specific vocational preparation of six months to four years. (Id. at 6.) Therefore, these four jobs do not provide direct entry into the job market. (Id.) Claimant asserts that due to her accident, she may not be able to perform the fifth interviewer job, that of charge account clerk, DOT § 205.367-014. (Id. ) She thus, asserts that "additional information needs to be taken on this matter before the presiding ALJ has significant evidence to base his determination if these jobs could be done after an accident." (Id.)

Claimant further asserts that the VE identified the job of "information clerk" as one which, according to the DOT, Claimant was capable of performing. (Id. at 6-7.) Claimant asserts however,

18

that there are seven information clerk jobs under the <u>DOT</u>, §§ 249.262-010, 237.367-026, 237.267-010, 237.367-046, 237.362-022, 237.367-038, and 352.677-014, and that two of the seven are light in exertional level, and that three of the remaining five jobs require specific vocational preparation of six months to four years. (<u>Id.</u> at 6.) Regarding the remaining two jobs, Claimant asserts that they "would not be suitable for someone recently out of an accident followed by corrective surgery and does not account for the 95,000 jobs listed in the national economy per the testimony of the Vocational Expert." (<u>Id.</u> at 6-7.) The Commissioner argues that Claimant fails to establish a conflict between the VE's testimony and the DOT, and therefore, that the ALJ's decision is supported by substantial evidence. (Def.'s Br. at 10-11.)

SSR 00-4p, which became effective December 4, 2000, and was in effect at the time of the administrative hearing in 2005, states that before an ALJ can rely on Vocational Expert testimony, he or she must identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by the vocational expert and information contained in the DOT and explain in the determination or decision how any conflict that has been identified was resolved. Social Security Ruling 00-4p, 2000 WL 1898704 (December 4, 2000).

Claimant concedes that at least one interviewer job and one reception/information clerk, as identified by the VE and the ALJ, is performed at the sedentary exertional level and at the unskilled level regarding specific vocational preparation. Accordingly, the Commissioner is correct in arguing that Claimant has not established a conflict between the VE's testimony and the <u>DOT</u>. The Court has already determined that the ALJ's RFC was appropriate and supported by substantial evidence of record. Accordingly, the Court finds that Claimant's argument is without merit and that substantial evidence supports the ALJ's decision.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion to Remand (Doc. No. 13.) is **DENIED**, Defendant's Motion for Judgment on the Pleadings (Doc. No. 14.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

ENTER: September 27, 2007.

R. Clarke VanDervort
United States Magistrate Judge